**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| **C.G.,** on behalf of themselves and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**Virginia Hospital Center Arlington Health System d/b/a VHC Health,**<br><br>Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff **C.G.**[1] at all times relevant herein has been a patient at Virginia Hospital Center Arlington Health System d/b/a VHC Health ("VHCA" or "Defendant") hospitals and/or clinics. Plaintiff brings this class action lawsuit against Defendant in her individual capacity and on behalf of all others similarly situated, and alleges upon personal knowledge as to her own actions, her counsels' investigation, and upon information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. Plaintiff brings this class action lawsuit to address Defendant's unlawful practice of intercepting and disclosing Plaintiff's and putative class members' ("Class" or "Class Members") confidential communications, personally identifiable information ("PII"), and protected health information ("PHI") (collectively, with PII referred to as "Private Information") to Google and/or its advertising partners such as Meta (herein the "Unauthorized Party")—without

[1] Plaintiff brings this putative class action lawsuit anonymously out of desire to protect their protected health information under the Health Insurance Portability and Accountability Act of 1996 and Virginia law.

Plaintiff or Class Members' consent, through the use of tracking software that Defendant installed, configured, and utilized on its website.

2. Information about a person's physical and mental health is among the most confidential and sensitive information in our society, the mishandling of which can have serious consequences, including discrimination in the workplace or denial of insurance coverage. In recognizing the sensitive and private nature of such medical information, state and federal legislators have enacted multiple laws and regulations specifically drafted for the purpose of ensuring this information is kept confidential and that patients maintain autonomy over their Private Information.

3. Defendant owns and controls https://www.vhchealth.org/ (the "Website"), which it encourages patients to use in order to identify, coordinate, and receive medical care and services as patients of VHCA.

4. Patients are encouraged to use the Website, including the "find a doctor" webpage, bill pay pages, booking features, and related webpages aimed at explore health services, pay for care, access their patient portal, and learn more about the services they offer. In doing so, visitors frequently input sensitive Private Information, including private and confidential information related to their health conditions, treatment, and medical care needs. VHCA's conduct is directly contrary to its explicit statement in its Privacy Policy that it "will not use or disclose [Plaintiff and Class Members'] protected health information for marketing purposes without [] authorization."[2]

5. The Website functions as a health care-seeking and patient services tool. Users run free-text searches for medical conditions, treatments, and symptoms; research specific services, providers, and facilities; search for and select clinic and hospital locations; schedule medical

[2] See https://www.vhchealth.org/privacy/ (last visited August 24, 2026).

appointments; access the MyVHC Patient Portal; pay medical bills; and request medical records. Many of these activities, particularly scheduling appointments, paying bills, accessing the patient portal, and requesting medical records, are performed by existing VHCA patients. In each instance, users disclose sensitive information about their own health conditions, care needs, and status as patients of Defendant.

6. Unbeknownst to visitors of Defendant's Website using these online services, including Defendant's patients such as Plaintiff and the Class, VHCA surreptitiously intercepts patients' communications using the trackers' code embedded on its website ("Tracking Tools") and transmits their Private Information to Unauthorized Party ***without consent***.

7. As alleged below, the captured requests and page content identify VHCA branding and transmit users' affirmative medical, provider, prescription, eligibility, and coverage communications together with persistent identifiers. On information and belief, VHCA deployed, directed, authorized, configured, or caused the deployment of the challenged trackers as part of that integrated workflow. When visitors run medical searches, navigate the coverage-application and plan-selection workflow, or research providers, the trackers cause the Third-Party Recipients to acquire those communications in real time together with identifiers capable of persistently linking the activity to a browser, device, account, or user.

8. As a result of Defendant's conduct, Plaintiff and Class Members suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) diminution of value of their Private Information; (iv) statutory damages; and (v) the continued and ongoing risk to their Private Information.

9. Plaintiff seeks to remedy these harms and brings causes of action for (i) violations of the Electronic Communications Privacy Act ("ECPA") 18 U.S.C. § 2511(1)—unauthorized

interception, use, and disclosure; (ii) breach of confidence; (ii) Unauthorized use of Name; (iv) unjust enrichment; and (v) breach of implied contract.

## II. THE PARTIES

10. Plaintiff **C.G.** is a natural person and citizen of Arlington, Virginia, where he/she intends to remain.

11. Defendant **Virginia Hospital Center Arlington Health System d/b/a VHC Health** is a not-for-profit healthcare provider in Arlington County, Virginia, with annual revenue of approximately $1.2 billion. VHCA's principal place of business is 1701 North George Mason Drive, Arlington, Virginia 22205. Its registered agent is Melanie Reza, located at 1701 North George Mason Drive, Arlington, Virginia 22205. VHCA's headquarters are located at 1701 North George Mason Drive, Arlington, Virginia 22205. Today, Arlington Health operates as a 537-bed health system servicing Northern Virginia and the Washington, DC, metropolitan area.[3]

12. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 ("HIPAA")).

13. All of Plaintiff's claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents, and/or assigns.

## III. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than one hundred (100)

[3] *See* https://www.vhchealth.org/about-us/our-history/

members in the proposed class, and at least one (1) member of the class is a citizen of a state different from Defendant.

15. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges questions of federal law under the ECPA (18 U.S.C. § 2511, *et seq.*).

16. This Court has supplemental jurisdiction over Plaintiff's state-law and common-law claims under 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as the federal claims.

17. This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

18. Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant's principal place of business is in this District.

## IV. COMMON FACTUAL ALLEGATIONS

### A. Third-Party Trackers on Healthcare Websites.

19. Consumer tracking technologies are pervasive across the internet, including on healthcare websites. Healthcare entities *must* obtain their patients' informed consent to use these technologies, as these sophisticated tracking tools allow third-party advertisers and technology giants to collect users' personal data, communications, and online activities for their own profit.

20. Without consent, Defendant has knowingly embedded these sophisticated tracking technologies on its Website, causing its patients' sensitive communications and online activity to be transmitted to the Unauthorized Parties.

21. To understand Defendant's unlawful data-sharing practices, it is important to first understand basic web design and the function of common tracking tools.

22. Devices (such as computers, tablets, or smartphones) access web content through a web browser (*e.g.*, Google's Chrome browser).

23. Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

24. Web communications consist of HTTP or HTTPS requests and HTTP or HTTPS responses, and any given browsing session may consist of thousands of individual HTTP requests and HTTP responses, along with corresponding cookies:

- **Universal Resource Locator ("URL")**: a web address.[4]
- **HTTP Request**: electronic communication sent from the client device's browser to the website's server. GET requests are one of the most common types of HTTP requests. In addition to specifying a particular URL, GET requests can also send data to the host server embedded inside the URL, and can include cookies.[5]
- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP requests from client devices to the host server. Some cookies are "third-party cookies," which means they are not required for the functioning of

---

[4] https://www.oppl.org/news-events/digital-learning/tech-tips-what-is-a-url/ https://developer.mozilla.org/en-US/docs/Learn_web_development/Howto/Web_mechanics/What_is_a_URL (last visited Aug. 4, 2026

[5] https://aws.amazon.com/compare/the-difference-between-https-and-http/; *see also* https://www.codecademy.com/article/what-is-http

the website in contrast to "first-party" cookies, and can store and communicate data when visiting one website to an entirely different website.[6]

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP request. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data.[7]

25. Every website is comprised of markup and "source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back end of the website, and the user does not see what happens in the source code.

26. Source code may also command a web browser to send data transmissions to third parties in the form of HTTP requests that are invisibly executed in the background without notifying the person using the web browser. For example, the Tracking Tools in this case are snippets of code that Defendant embedded in its Website's source code, thereby instructing a user's browser to send transmissions to Google's own web servers.

27. By contrast, the Markup is the façade of the website, and it is the only part that website visitors see when they access a website. For example, a patient's HTTP request seeks specific information from the Defendant's Website (*e.g.*, "Find A Doctor" page), and the HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

---

[6] https://www.ftc.gov/policy-notices/privacy-policy/internet-cookies
[7] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

28. Similarly, when a patient visits Defendant's Website and selects the "Find a Doctor" button, their web browser automatically sends an HTTP request to Defendant's web server. Defendant's web server automatically returns an HTTP response, which loads the markup for that particular webpage. As pictured below, patients only see the markup, not Defendant's source code or underlying HTTP requests and responses:[8]




***Figure 1****. The image above is a screenshot taken from a web browser upon visiting https://www.vhchealth.org/find-a-doctor/.*

29. When a user visits the Website, their browser sends an HTTP request to the Website's server to load the page. In response, the server sends back the webpage, which may contain a small piece of code known as a "tracker," or a "pixel."

30. The tracker is a script that runs in the background and collects information about the user. The tracker usually instructs the browser to send the user's IP address, along with other identifying data like cookies, browser details, and device information, as well as the user's inputs

[8] https://www.vhchealth.org/find-a-doctor/ (all figures are being used for illustrative purposes and not as direct evidence of Plaintiff's PII being intercepted).

on the website, to third-party trackers like the Unauthorized Parties. This allows the embedded tracker to monitor user activity, intercept communications, and gather insights about the users' behavior on the site.

31. Tech companies like Google offer Tracking Tools as software that entities, including healthcare providers, can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and activity on those platforms.

32. These Tracking Tools are typically offered to entities like Defendant for "free." In fact, however, they are bartered in exchange for Defendant's patients' data.

33. The Tracking Tools are used to gather, identify, target, and market products and services to Defendant's patients.

34. When a user accesses a webpage that is hosting Tracking Tools, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to the Unauthorized Parties. As a result, Google intercepts what patients communicate to Defendant via Defendant's Website and/or patient portal. Notably, these unauthorized transmissions only occur on webpages that contain Tracking Tools. Thus, Plaintiff's and Class Members' Private Information would not have been disclosed to Unauthorized Parties via this technology but for Defendant's deliberate and intentional decision to install the Tracking Tools on its Website.

35. The Unauthorized Party that receives patient communications via Tracking Tools does not provide any substantive website content relating to the user's communications. Instead, they harvest user data and communications for the website owner's marketing purposes (*i.e.*, to bolster profits) and for their own benefit.

### B. The Department of Health and Human Services ("HHS") and the Federal Trade Commission ("FTC") Have Warned about the Use of Tracking Tools by Healthcare Providers in violation of HIPAA and Virginia Law.

36. VHCA's conduct and use of the Tracking Tools is contrary to federal regulatory rules and is in violation of HIPAA.

37. In January 2013, HHS issued a final rulemaking notice regarding modifications to the HIPAA privacy, security, enforcement, and breach notification rules under the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act") to "strengthen the privacy and security protection for individuals' health information."[9]

38. As part of that final rulemaking, which became effective on March 26, 2013, HHS stated that, to be considered PHI under HIPAA, PHI did "not necessarily [need to] include diagnosis-specific information, such as information about the treatment of an individual."[10] Instead, "[i]f the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected … in accordance with the HIPAA rules." *Id.*

39. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of Tracking Tools on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[11]

---

[9] 78 Fed. Reg. 5566 (January 25, 2013).
[10] 78 Fed. Reg. at 5598.
[11] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for- professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis added).

In other words, HHS has expressly stated that entities like Defendant that use Tracking Tools—and disclose patient information in the process of using these Tracking Tools—have violated HIPAA Rules unless those entities obtain a HIPAA-compliant authorization.

40. The HHS Bulletin further warns that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[12]

41. Additionally, HHS has warned healthcare providers that PHI and PII are not limited exclusively to patient portals or specific website pages, and thus Defendant still has an obligation to protect information on non-password-protected (*i.e.*, "unauthenticated") webpages.

42. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (*i.e.*, that is indicative that the individual has received or will receive health care services or benefits from the covered entity) … relates to the individual's past, present, or future health or health care or payment for care."[13]

43. The HHS Bulletin went on to state:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. ***For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.***[14]

---

[12] *Id.*
[13] *Id.*
[14] *Id.* (emphasis added).

44. In addition, HHS and the FTC have recently issued a letter, once again admonishing and directing entities like Defendant to stop using Tracking Tools:

> If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. ***The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI. . .*** Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. . . As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[15]

45. Despite this guidance and HIPAA's requirements, VHCA intended to, and did, share and monetize its patients' information in violation of HIPAA.

46. Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' ***express written*** authorization.[16]

47. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed

---

[15] *Re: Use of Online Tracking Technologies*, U.S. Dept. of Health & Hum. Servs. and Fed. Trade. Comm'n (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/ocr-ftc_redacted_letters.pdf

[16] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

48. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it knowingly discloses individually identifiable health information relating to an individual, as those terms are defined under HIPAA, to the Unauthorized Parties.

49. VHCA's acquisition of patient communications that were used and disclosed to Google and other third parties were done for purposes of committing a criminal and tortious act in violation of the laws of the United States and Virginia, including:

a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6; and

b. Violation of the Virginia Health Records Privacy Act ("VHRPA") § 32.1-127.1:03(A).

50. VHCA's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

b. Disclosed individually identifiable health information to Google and other third parties without patient authorization.

51. Virginia law also provides that health records may only be used or disclosed consistent with prior authorization or without such authorization in particular circumstances. VHCA has also violated the Virginia Health Records Privacy Act ("VHRPA") through its conduct. *See* VA. Code Ann. § 32.1.-127.1:03.

52. The VHRPA § 32.1-127.1:03(A) codifies a patient's right to the privacy of their health records.

53. Plaintiff's and Class Members' communications of Private Information to VHCA Health via its websites are "Health Records" defined under § 32.1-127.1:03(B).

54. The VHRPA provides that "except when permitted or required by this section ..., no health care entity, or other person working in a health care setting, may disclose an individual's health records." § 32.1-127.1:03(A).

55. VHCA's conduct violated the VHRPA where it disclosed its patients' Private Information to Google and other third parties without their express authorization or consent.

56. As such, VHCA cannot viably claim any exception to ECPA liability.

**C. Defendant Disclosed Plaintiff's and Class Members' Private Information to Google.**

57. In this case, Defendant employed Tracking Tools to intercept, duplicate, and redirect Plaintiff's and Class Members' Private Information to Google.

58. The Tracking Tools secretly instructed patients' browsers to intercept and duplicate the patients' communications with Defendant (HTTP requests) in real time and to send those communications to Unauthorized Parties. These transmissions occur contemporaneously, invisibly, and without the patients' knowledge. The Tracking Tools are not mere "session replay" technology, but, as described below, capture the substance and meaning of users' communications with Defendant on the Website.

59. Thus, without its patients' consent, Defendant has effectively used its source code to embed Tracking Tools that commandeer and "bug" or "tap" into its patients' computing devices, allowing the Unauthorized Party to listen in on or view Plaintiff's and Class Members' communications with Defendant and thereby intercept those communications, including the Private Information contained therein.

60. This intercepted information can easily be traced back to the user. The Tracking Tools intercept the User's Communications along with their IP address and unique Digital Identifiers. Moreover, when the user is logged into their accounts, like their Google accounts, when using VHCA's website, identifiers are transmitted to the Tracking Tools that can link users to their account information.

### *i. Google's Marketing Platform.*

61. Google is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms and generates most of its revenue through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its products and services, which it then leverages to deliver targeted advertisements. VHCA has implemented Google's advertising and analytics technologies—including Google Ads and Google Analytics—on its Website.

62. Google Analytics is a web analytics service offered within the Google Marketing Platform that allows website operators to track visitors' actions on their website in order to measure traffic and engagement, personalize content, and implement targeted advertising. Google Ads is Google's advertising product, which uses conversion-tracking and remarketing tags to attribute user actions and build advertising audiences. Both are JavaScript-based tracking technologies that load automatically and immediately whenever a user visits a page containing the code, and execute in the background without any visible indication to the user.

63. Google collects user data through services such as Google Analytics, allowing website owners to enhance user experience, personalize content, and implement effective targeted advertising.

64. Google runs one of the largest online advertising platforms in the world, earning more than $200 billion in annual revenue, largely from targeted advertising. The company's business model relies heavily on gathering extensive user data across its wide range of products and services—such as Google Search, Gmail, YouTube, and Android—which it uses to deliver highly personalized ads.

65. Google's tracking technologies acquire and collect data points about user interactions with a website and transmit details of those interactions to Google (via requests to endpoints such as analytics.google.com). Along with these events, the trackers transmit persistent cookies and identifiers, including the _ga cookie and Google advertising cookies (such as 3PSID, 3PAPISID, 3PSIDCC, and NID). The "3PSID," "3PAPISID," and "3PSIDCC" cookies are used to identify users by expressly linking their browsing activity to users' Google accounts when they are signed in. The values of these cookies are unique to each account holder and persist across sessions and devices as long as the user remains signed in. These identifiers can enable Google to recognize and link activity associated with the same browser, device, or account across interactions and contexts. Where a user is signed into a Google account, Google may be able to associate transmitted activity with that authenticated account. As alleged below, Plaintiff was signed into Gmail during her searches, making the account-linkage allegation particularly concrete as to her. Whether standing alone or combined with account and other data available to Google, these persistent identifiers permit linkage of the transmitted communications and support the allegation that the disclosures were not anonymous.

66. When creating a Google account, users must provide an email address. This means that any data collected alongside the 3PSID, 3PAPISID, and 3PSIDCC cookies—such as communications on Defendant's Website and/or patient portal—can be tied by Google to a

specific, identifiable email. In addition, many users voluntarily share further personal details with Google, including their full name, phone number, home and work addresses, profile photo, and recovery email, either during account setup or while using other Google services. As a result, Google can connect cookie-based data not only to an email address but to a named, detailed, and highly individualized user profile. This allows the company to link a user's private activity on sites like Defendant's to their name and broader digital identity, especially when combined with other data from across Google's ecosystem.

67. In contrast, the "NID" cookie collects information from users even when they never signed in or are signed out of their Google accounts. The data gathered by these cookies is used to create user profiles based on individual interests, enabling Google to deliver more targeted advertisements. The NID cookie is linked to a user's browser rather than a named account. However, it still carries a unique identifier that remains active for about six (6) months—unless the user manually clears their cookies, in which case Google automatically generates a new identifier.

68. Once deployed, Google Analytics loads instantly whenever a user visits a page containing their source code. The tracking scripts run silently in the background, with no visible indication to the user, rendering them undetectable to ordinary website visitors. Only those with technical expertise—such as individuals who inspect the page's source code or use specialized browser tools—may notice the presence of these trackers and the interception of their communications by Google. Because of this hidden operation, most users remain unaware that their electronic communications are being captured by third parties like Google.

***ii. Visitors' Search Activity on VHCA's Website is Shared with Google's Marketing Platform.***

69. When patients interact with Defendant's website, their Private Information is intercepted without their consent.

70. Upon entering Defendant's Website, patients may select from options such as "Pay My Bill," "Contact Us," "MyVHC Patient Portal," "Find a Doctor," "Medical Services," "Patients & Visitors," "In-Person Care," "Virtual Care," "Get Care Now," and more.




**Figure 2**. *Screenshot showing VHCA's homepage.*

71. When a person begins using the Website, Defendant's source code alters how their browser functions such that their online interactions are intercepted and disseminated via the Tracking Tools as they communicate information with VHCA via the Website, including on the search bar, the Find a Doctor page, and other sensitive webpages intended for VHCA's patients.

72. To illustrate the types of Private Information that Defendant's Tracking Tools intercepted and shared with Google, counsel used the Website and analyzed network traffic transmissions emanating from the "Find a Doctor" webpage, the general search bar located on Defendant's website, and other sensitive web pages wherein Plaintiff and Class Members communicated Private Information.

73. The Tracking Tools operated uniformly during the relevant time period when Plaintiff and Class Members used the Website, and the screenshots herein represent merely a fraction of Defendant's Website.

74. Using the "Find a Doctor" page as merely one example, Figures 3-




**Figure 3.** *Screenshot showing that the user has typed "Ami Patel" in the box titled "Provider Name" and selected "Gastroenterology."*



# Ami P. Patel, DO

Specialties: Gastroenterology and Internal Medicine

4.9 / 5

(Based on 59 Ratings)

Read Reviews | About Ratings

VHC HEALTH MEDICAL GROUP

Call 703-524-4792

Schedule with Care Team

***Figure 4.*** *Upon clicking the "Search" button shown in Figure 3, the Website populates the provider's profile page, which includes the "Schedule with Care Team" button.*




***Figure 5.*** *Upon clicking the "Schedule with Care Team" button shown in Figure 4, Defendant directs the user to identify themselves as either a current patient or new patient using buttons titled "I am a Current Patient" and "I am a New Patient."*

| | |
|---|---|
| tag_exp | 115616985~115938466~115938469~118897920~118897930~120213116~120385422~120469145~120469153 |
| dl | https://www.vhchealth.org/schedule/gastroenterology-scheduling/ |
| sid | 1790793645 |
| sct | 13 |
| seg | 1 |
| dr | https://www.vhchealth.org/find-a-doctor/profile/ami-patel/ |
| dt | Gastroenterology Scheduling \| Arlington & DC Metro \| VHC Health |
| en | services_schedule_button_current |
| _c | 1 |
| ep.link_text | I am a Current Patient |
| ep.link_url | |
| ep.area | Schedule pages |
| ep.action | Schedule button click |
| _et | 2 |
| tfd | 77987 |

***Figure 6.*** *Screenshot showing that when the user identifies themselves as either a current or new patient, their selection is recorded and transmitted to Google alongside the phrases "I am a Current Patient," "services_schedule_button_current," "vhchealth.org/schedule/gastroenterology-scheduling/," "vhchealth.org/find-a-doctor/profile/ami-patel/," "Gastroenterology Scheduling / Arlington & DC Metro / VHC Health," "Schedule button click."*




***Figure** 7. The first line of text contains the endpoint "analytics.google.com" and subsequent lines of text contain sensitive phrases such as "schedule . . . gastroenterology-scheduling," "www.vhchealth.org," "services_schedule_button_current," "find a doctor . . . profile . . . Ami Patel," and "Gastroenterology Scheduling Arlington VHC Health."*

75. As discussed in the Figure descriptions, Google received the following data as a result of Defendant's decision to install and configure Tracking Tools on the Website:

a. "I am a Current Patient,"

b. "services_schedule_button_current,"

c. "vhchealth.org/schedule/gastroenterology-scheduling/,"

d. "vhchealth.org/find-a-doctor/profile/ami-patel/,"

e. "Gastroenterology Scheduling / Arlington & DC Metro / VHC Health,"

f. "Schedule button click,"

g. "schedule . . . gastroenterology-scheduling,"

h. "www.vhchealth.org,"

i. "services_schedule_button_current,"

j. "find a doctor . . . profile . . . Ami Patel," and

k. "Gastroenterology Scheduling Arlington VHC Health."

This reveals the user's patient status, the specific type of medical care they are seeking, the fact that they are scheduling an appointment for medical treatment, their physician's name, their physician's specialty, their location, and more.

76. Likewise, if a user instead selects "In Person Care" from the homepage (as opposed to using the "Find a Doctor" tool, their communications are still transmitted to Google throughout this process. If the user clicks "Make an Appointment" under the "Primary Care" tab, and proceeds to schedule an appointment with a specific physician, the terms "Primary Care Scheduling" and the physician's name are transmitted in real time to Google Analytics.

77. In both instances, and in the other scenarios described herein, Google receives the data alongside persistent identifiers that allow Google to match specific browsing sessions to specific individuals.

78. In addition to scheduling, the exact text and phrases that patients typed into the general search bar located on Defendant's Website were transmitted, word-for-word, to Google.

79. Further, when using the "Medical Services" page, visitors can search by specialty, condition, provider, and location. For example, a search for "gynecology," followed by a subsequent click on "Urogynecology," would be intercepted by the Tracking Tools and transmitted to Unauthorized Parties, including Google, in a similar manner as described above.

80. Similarly, user interactions with the Website's bill payment functionality are intercepted and disclosed to Google. When a user clicks the "Pay My Bill" tab located on the

Website's homepage, that communication is transmitted to Google Analytics along with unique identifying third-party cookies.

81. The Tracking Tools also intercept and transmit users' requests for medical records. When a user navigates to the "Patients & Visitors" tab on the Website's homepage and selects the "Medical Records" option, those interactions are transmitted to Google Analytics. When the user subsequently clicks the "Request Medical Records" link, they are redirected to an external webpage (https://www.swellbox.com/virginia-hc-wizard.html), and this redirection is also transmitted to Google Analytics together with the same identifying cookies.

82. Notably, scheduling appointments, paying medical bills, and requesting medical records are activities undertaken exclusively or predominantly by existing VHCA patients. The transmission of these interactions to Google, paired with persistent identifying cookies, discloses not only that an identifiable individual is a current patient of Defendant, but also the specific nature of their engagement with Defendant's healthcare services.

83. Defendant failed to disclose that its Website tracks, intercepts, records, and transmits patients' Private Information to Google and potentially other Unauthorized Parties, and Plaintiff was unaware of these practices when she used the Website in connection with their ongoing medical care and treatment.

84. Further, on information and belief, Defendant also shared Plaintiff and Class Members' Private Information with Meta as part of Defendant's marketing practices based on Defendant's use of Meta Business Tools for marketing. Figure 8 below demonstrates that, at a minimum, Defendant launched six marketing campaigns that were active between April 2026 and July 2026.




***Figure 8.*** *Screenshot taken from the Meta Ad Library showing that Defendant launched several Meta marketing campaigns from its business account titled VHC Health and used Meta's advertising ecosystem to target audiences on Facebook, Instagram, Thread, and other platforms.*

85. Plaintiff is presently unaware of the full extent of Defendant's tracking practices, but the Website may have included the Meta Pixel, which Defendant could have either installed directly on the Website or configured via the Google Tag Manager or using other Tracking Tools.

86. Defendant's use of Tracking Tools intercepted patients' communications to Defendant, in real time, and sent the Private Information to the Unauthorized Parties, including but not limited to Plaintiff's and Class Members': (i) status as medical patients; (ii) health conditions; (iii) desired medical treatment or therapies; (iv) desired locations or facilities where treatment was sought; (v) phrases and search queries (such as searches for symptoms, treatment options, or types of providers); (vi) searched and selected physicians and their specialties conducted via the general search bar; and (vii) access to their patient portal.

87. Defendant deprived Plaintiff and Class Members of their privacy rights when it: (i) implemented Tracking Tools that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (ii) disclosed patients' protected information to Unauthorized Parties; and (iii) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their consent.

**D. Defendant's Patients Have an Expectation of Privacy**

88. VHCA patients believed that their Private Information communicated on the Website would not be shared with third parties without their consent. At no time did VHCA provide sufficient notice or receive consent from Plaintiff to: (1) obtain and disseminate their Private Information via Tracking Tools; (2) share their Private Information with Google or Meta; or (3) use their Private Information for marketing purposes, including but not limited to targeting marketing campaigns VHCA launched in partnership with Meta, Google, or any other

advertising company.

89. Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

90. Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with Unauthorized Parties for a commercial purpose, unrelated to patient care.

91. When Plaintiff and Class Members used Defendant's Website in conjunction with the medical treatment they received from Defendant, they had a reasonable expectation that the information they communicated via the Website would not be disclosed to Unauthorized Parties.

92. Plaintiff and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant, and would not have paid for Defendant's healthcare services, or would have paid less for them, had they known that Defendant would disclose their Private Information to Unauthorized Parties.

93. In fact, Defendant's Privacy Policy describes that the Website uses personal information users provide only for: "Treatment," "Payment," "Health Care Operations," "Business Associates," "Hospital Directory," "Contacting You about Services," "Philanthropy," "Individuals Involved in Your Care or Payment for Your Care," "Research," "As Required or Authorized by Law," "Health Oversight Activities," " Lawsuits and Disputes," "Law Enforcement," "Public Threat to Health or Safety," "Minors," "Parents," "Deceased Individuals," "Incidental Uses and Disclosures," and "Health Information Exchange."

94. While the Privacy Policy presents multiple uses for the information collected,

it ***does not*** state that any collected information will be used for marketing or behavior-based advertising ***without authorization***.[17]

95. Indeed, the Notice of Privacy Practices ***affirmatively misrepresents*** that, "[w]e will obtain your authorization for uses and disclosures of your health information that are not described in the notice above. … Unless permitted by applicable law, we will not use or disclose your protected health information for marketing purposes without your authorization. Moreover, if we will receive any financial remuneration from a third party in connection with marketing, we will tell you that in the authorization form."

96. Defendant's Notice of Privacy Practices also states, "[w]e will not sell your protected health information to third parties without authorization. Any such Authorization will state that we will receive remuneration in the transaction."[18] However, as demonstrated above, the Website ***does*** collect and share information for marketing and advertising purposes without user consent, including PII and PHI.

97. Although VHCA provides certain representations of maintaining its Website's users' Private Information secured from third parties, the Tracking Tools, as described above, allow Unauthorized Parties to access information unique to the user's searches and data input into Defendant's Website. Thus, VHCA's Privacy Policy is not compliant with HIPAA.

98. During the relevant time period, VHCA updated its Website to include a "Website Cookie Notice" at the bottom of its homepage. The "Website Cookie Notice," is materially deceptive, fails to disclose that VHCA is using Tracking Tools on the Website, fails to

[17] *See* https://www.vhchealth.org/privacy/ (last visited September 1, 2026).
[18] Notice of Privacy Practices, VHCA, https://www.vhchealth.org/app/files/public/20657257-f1bf-4f51-aaac-2eb095a68b2c/2%2016%202026%20NPP%20Final%20on%20Forms%20on%20Demand.pdf.

disclose that data is being shared with Google and other unauthorized parties, and does not explain that the cookies in question will be by VHCA or Google for identity resolution or targeted marketing.




***Figure 9.*** *Screenshot depicting the purported "Website Cookie Notice" VHCA's Website.*

99. The notice merely states, "We use cookies to improve your experience and personalize content. By continuing to browse this site, you agree to our use of cookies. Please see our Privacy Notice for details. Third-party sites have their own privacy practices. Accept and Close."

100. First, the notice represented that cookies were used to "improve your experience and personalize content." A reasonable healthcare-site visitor would understand that representation to refer to user-facing functions such as preserving preferences, remembering accessibility or language settings, maintaining a session, or tailoring content displayed by Defendant. The notice did not disclose that Defendant used Tracking Technologies to transmit visitors' search terms, including the exact text entered into Defendant's general search field and physicians' names entered through Defendant's "Find a Doctor" feature, to Google in connection with analytics, advertising, identity-resolution, audience-building, attribution, conversion measurement, remarketing, and related commercial purposes.

101. The difference is material. "Personalizing content" describes an apparent on-site benefit to the user. Identity resolution, conversion measurement, advertising attribution, audience creation, and cross-context behavioral advertising instead enable Defendant and Google

to recognize or attempt to recognize users across interactions, evaluate marketing performance, connect patients' communications to persistent identifiers, and optimize the acquisition, targeting, or retargeting of patients. Defendant did not disclose those purposes.

102. Second, the cookie notice failed to disclose the recipients of visitors' information. It did not identify Google, Google Analytics, Google Ads, Google Marketing Platform, or any other entity that received the information. Nor did it disclose that third parties received communications revealing the exact phrases users typed, their specific medical conditions, and other PHI.

103. Third, the notice failed to disclose that the substantive communications were transmitted together with persistent or unique identifiers, thereby permitting the recipient to recognize the same individual over time and link their health-care-related communications to other information available to that recipient.

104. Fourth, the cookie notice blurred—or omitted entirely—the distinction between first-party and third-party technologies. Defendant did not tell visitors which cookies or identifiers were set, read, or received by Defendant; which were set, read, or received by Google or other third parties; or whether any third-party technology was deployed through a first-party domain, first-party script, server-side configuration, reverse proxy, CNAME alias, or other implementation that made third-party collection appear to be first-party activity. A reasonable visitor could not understand the identity of the recipient, the true scope of the collection, or the identity-resolution function of the technologies from the notice.

105. Fifth, Defendant gave Plaintiff and Class Members no meaningful choice. As shown in Figure 6, the sole option available is "Accept and Close;" the cookie banner contains no "Reject," "Decline," "Manage Preferences," or equivalent control; no category-specific selection;

no mechanism to disable advertising, analytics, identity-resolution, conversion, or remarketing technologies; and no mechanism to proceed using the Website without purportedly agreeing to nonessential tracking.

106. Likewise, the reference to the "Privacy Notice" did not cure these defects because Defendant's Privacy Notice affirmatively represented that Defendant would not use or disclose protected health information for marketing purposes without authorization.

107. The notice's statement that "[t]hird-party sites have their own privacy practices" was further misleading. The challenged disclosures did not arise merely because a visitor independently left Defendant's Website and chose to interact with an unrelated third-party site. They occurred because Defendant embedded, configured, authorized, or caused code on its own Website to collect and transmit visitors' communications to Google while the visitors were interacting with Defendant's Website.

108. Plaintiff did not knowingly agree to the transmission of her search communications, physician-name searches, persistent identifiers, or health-care-related activity to Google for advertising, analytics, attribution, identity-resolution, audience-building, or marketing purposes. Nor did Defendant obtain such informed consent from Class Members.

**E. Plaintiff C.G.'s Experience.**

109. Plaintiff C.G. is a current patient of Defendant.

110. Plaintiff C.G. has received and paid for healthcare services from Defendant.

111. Plaintiff C.G. has used Defendant's Website and Patient Portal to communicate Private Information to Defendant on numerous occasions and to receive healthcare services from Arlington Health facilities, at Defendant's direction, and with Defendant's encouragement.

112. Plaintiff C.G. uses Google Chrome internet browser on her mobile device and computer to access Defendant's Website.

113. Plaintiff C.G. has had a Google account for several years and remained logged into that account while using Defendant's Website on the device used to access it.

114. On numerous occasions, Plaintiff C.G. has accessed VHCA's Website on a mobile device and/or a computer for the purpose of searching for: (i) VHCA facilities; (ii) doctors; and/or (iii) treatment/symptoms.

115. Plaintiff C.G. used Defendant's Website and/or Patient Portal to conduct activities such as: (i) fill out forms to request/book medical appointments; (ii) search for particular doctors, specialists, and/or their locations; (iii) complete forms to request medical records/invoices; (iv) complete treatment authorization forms; (v) communicate with medical providers; (vi) review healthcare records; (vii) request medical bills/invoices; (viii) and pay medical bills.

116. Specifically, Plaintiff C.G. used Defendant's Website to research Urologists. After using Defendant's website for this purpose, Plaintiff C.G. saw medical ads online relating to Doctors in this specialty. The presence of these advertisements confirms Defendant's unlawful transmission of Plaintiff C.G.'s Private Information to Unauthorized Parties.

117. As Defendant's patient, Plaintiff C.G. reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to Unauthorized Parties. But for her status as Defendant's patient, Plaintiff C.G. would not have disclosed her Private Information to Defendant via its Website.

118. At all relevant times, Plaintiff C.G. was unaware of Defendant's Tracking Tools on its Website, and Defendant never disclosed to C.G. the use of such technology on Defendant's Website.

119. During her time as a patient, Plaintiff C.G. never consented to the use of her Private Information by Unauthorized Parties or to Defendant enabling Unauthorized Parties to access or interpret such information. However, Defendant's Website routinely provided Unauthorized Parties with patients' IP addresses, device IDs, persistent cookie identifiers, and/or user accounts or other information they input into Defendant's Website, like their home address, zip code, or phone number. This is precisely the type of information that HIPAA requires healthcare providers to anonymize to protect the privacy of patients. Plaintiff C.G. and Class Members' identities could be easily determined based on persistent cookie identifiers, IP address, and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

120. After Defendant's Tracking Tools on its Website intercepted and collected Plaintiff C.G.'s Private Information communicated to Defendant, the Tracking Tools transmitted it to the Unauthorized Parties (*e.g.*, Google) where they processed it, analyzed it, and assimilated it into datasets. Since Plaintiff C.G. is a Google user, Google has or will associate the information that it collects from C.G.'s Google account that identifies her name and other identifying information.

121. By using the Tracking Tools to intercept Plaintiff C.G.'s communications to Defendant and then transmitting that information to Unauthorized Parties, Defendant intercepted Plaintiff C.G.'s communications while accessing Defendant's Website, including the contents thereof, which encompassed the URL visited, the medical conditions and types of doctors searched, and/or other medical information related to her.

122. In sum, Defendant's Tracking Tools intercepted Plaintiff C.G.'s highly sensitive communications and Private Information to Defendant and transmitted it to Unauthorized Parties, including search terms and communications that contained private and confidential information, without Plaintiff C.G.'s knowledge, consent, or express written authorization.

123. Plaintiff C.G. suffered injuries in the form of: (i) invasion of privacy; (ii) diminution of value of her Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff C.G.'s medical information and other confidential information she communicated to Defendant via the Website.

124. Plaintiff C.G. has a continuing interest in ensuring that her future communications with Defendant are protected and safeguarded from future unauthorized disclosure, and she also has an interest in knowing which Unauthorized Parties—aside from Google—have received her Private Information since she first started using the Website.

**F. Defendant Was Enriched and Benefited from the Use of the Tracking Tools and Unauthorized Disclosures.**

125. Upon information and belief, the primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiff's and Class Members' Private Information was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data for advertising in the absence of express written consent. Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy. In exchange for disclosing the Private Information of its patients, Defendant is compensated, upon information and belief, by the Unauthorized Parties in the form of enhanced advertising services and more cost-effective marketing on its platform.

126. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

127. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients to get more patients to use its services. Defendant did so through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

128. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefiting Defendant while invading the privacy of Plaintiff and Class Members and violating their rights under federal and Virginia law.

129. Defendant derived a benefit from producing its patients' Private Information to Unauthorized Parties through Tracking Tools, and the Unauthorized Parties specifically targeted medical-related advertisements and/or saved key terms related to Defendant's services on users' Google accounts.

130. Defendant disclosed the Private Information of Plaintiff and the Class which would then be used by Defendant and/or Meta for marketing purposes.

131. Thus, Defendant was unjustly enriched and benefited from the use of Tracking Tools and disclosures to Unauthorized Parties at the expense of Plaintiff's and Class Members' privacy.

**G. Plaintiff's and Class Members' Private Information had Financial Value.**

132. Plaintiff's data and Private Information have economic value. Upon information and belief, Google also has recognized the value of user data and has even instituted " Screenwise

Trends Panel", which is a pilot program in which Google pays users $3 per week to track them online.[19]

133. Data harvesting is one of the fastest-growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data.[20] That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry-wide.[21]

134. The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[22]

135. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[23]

136. Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in

[19] https://www.moneymakingmommy.com/screenwise-trends/ (last visited August 21, 2026)
[20] *See* https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/
[21] *Id.*
[22] *See* https://time.com/4588104/medical-data-industry/ (last visited August 21, 2026)
[23] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with- requests-for-your-health-data.html.

exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course, or something else valuable."[24]

137. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

138. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, and SavvyConnect are all companies that pay for browsing historical information.

139. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[25]

## V. TOLLING

140. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that their Private Information was intercepted and unlawfully disclosed to Unauthorized Parties because Defendant kept this information secret, and the Tracking Tools are invisible to users on the Website.

## VI. CLASS ACTION ALLEGATIONS

---

[24] *See* VERO, HOW TO COLLECT EMAILS ADDRESSES ON TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/.

[25] *See* Tori Taylor, Hackers, Breaches, and the Value of Healthcare Data, SecureLink, https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

141. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated pursuant to Fed. R. Civ. P. 23.

142. The Classes that Plaintiff seeks to represent are defined as follows:

**Nationwide Class:**

> All individuals residing in the United States who are, or were, patients of Defendant or any of its affiliates, who used Defendant's Website in conjunction with their medical care.

**Subclass:**

> All individuals residing in Virginia who are, or were, patients of Defendant or any of its affiliates, who used Defendant's Website in conjunction with their medical care.

143. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

144. Plaintiff reserves the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

145. **Numerosity:** The Class is so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose Private Information may have been improperly disclosed via Defendant's Tracking Tools, and the Class is identifiable within Defendant's records.

146. **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to Unauthorized Parties;

c. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to Google, for marketing purposes;

d. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been divulged;

e. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

g. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

h. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information

147. **Typicality:** Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use of Tracking Tools, due to Defendant's misfeasance.

148. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to, and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

149. **Adequacy:** Plaintiff will fairly and adequately represent and protect the interests of Class Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class, and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

150. **Superiority and Manageability:** The Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

151. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

152. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

153. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

154. Defendant may continue in its failure to properly safeguard the Private Information of Class Members, Defendant may continue to intercept and disclose Class Members' Private Information to Unauthorized Parties through its Tracking Tools without consent, and Defendant may continue to act unlawfully as set forth in this Complaint.

155. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to Class Members as a whole is appropriate.

156. **Issue Certification**: Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the Parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant has a legal duty to not disclose Plaintiff and Class Members' Private Information to companies that have not executed a HIPAA-compliant business associate agreement;

b. Whether Defendant has a legal duty to not disclose Plaintiff and Class Members' Private Information without first obtaining their express authorized consent;

c. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to Google;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information communicated via its Website;

g. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## VII. CAUSES OF ACTION

**COUNT I**
**VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1) *et seq*.**
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On behalf of Plaintiff and the Classes)**

157. Plaintiff incorporates the above allegations as though fully set forth herein.

158. The ECPA protects both sending and receipt of communications.

159. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

160. The transmissions of Plaintiff's Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

161. The transmissions of Plaintiff's Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

162. **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

163. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

164. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

165. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices;

c. Defendant's web servers; and

d. The Tracking Tools deployed by Defendant to effectuate the sending and acquisition of patient communications.

166. By utilizing and embedding Tracking Tools on its Website, Defendant intentionally intercepted, endeavored to intercept, and did procure, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

167. Specifically, Defendant intercepted Plaintiff and Class Members' electronic communications via Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiff and Class Members' Private Information to Unauthorized Parties including Google, as discussed herein.

168. In this case, Defendant employed Tracking Tools to intercept, duplicate, and redirect Plaintiff's and Class Members' Private Information to Google.

169. The Tracking Tools secretly instructed patients' browsers to intercept and duplicate the patients' communications with Defendant (HTTP requests) in real time and to send those communications to Unauthorized Parties. These transmissions occur contemporaneously, invisibly, and without the patients' knowledge. The Tracking Tools are not mere "session replay" technology, but, as described below, capture the substance and meaning of users' communications with Defendant on the Website.

170. Thus, without its patients' consent, Defendant has effectively used its source code to embed Tracking Tools that commandeer and "bug" or "tap" into its patients' computing devices, allowing the Unauthorized Party to listen in on or view Plaintiff's and Class Members' communications with Defendant and thereby intercept those communications, including the Private Information contained therein.

171. This intercepted information can easily be traced back to the user. The Tracking Tools intercept Plaintiff and Class Members' Communications along with their IP address and unique Digital Identifiers. Moreover, when the user is logged into their accounts, like their Google accounts, when using VHCA's website, identifiers are transmitted to the Tracking Tools that can link users to their account information.

172. These intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members' that contain Private Information.

173. By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiff and Class Members to Unauthorized Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

174. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

175. Defendant was not acting under color of law to intercept Plaintiff's and the Class Member's wire or electronic communication.

176. Plaintiff and Class Members did not authorize Defendant to acquire the contents of their communications for purposes of invading Plaintiff's privacy via the Tracking Tools.

177. Plaintiff and Class Members did not consent to Defendant's interception and sharing of their health information.

178. As a direct result of Defendant's violations, Plaintiff and Class Members are entitled to: (a) actual damages or statutory damages of $100.00 per day per violation or $10,000.00, whichever is greater; (b) punitive damages; and (c) reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

## COUNT II
## BREACH OF CONFIDENCE
## (On Behalf of Plaintiff and the Classes)

179. Plaintiff incorporates the above allegations as though fully set forth herein.

180. Medical providers have a duty to their patients to keep non-public medical information completely confidential.

181. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on

Defendant's Website.

182. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed Tracking Tools to disclose and transmit Plaintiff's and Class Members' communications, including Private Information, to Unauthorized Parties.

183. These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

184. Plaintiff used Defendant's Website to find medical providers, search for medical treatment, facility locations, and medical services, and communicate with Defendant regarding their health and conditions. In doing so, Plaintiff communicated their protected health information related to their conditions to find doctors and information concerning those conditions and symptoms.

185. After communicating the information in the preceding paragraph, Plaintiff began to observe related advertisements for products and/or services related to the Private Information referenced in their communications with Defendant's Website. Therefore, the information Plaintiff shared with Defendant through its Website was not merely metadata but rather information directly related to Plaintiff's status as Defendant's patients and to their health.

186. Defendant provided unconsented, unprivileged disclosure to Unauthorized Parties of nonpublic information that Defendant had learned within a confidential relationship with Plaintiff.

187. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

188. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and

Class members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b. Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff' and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

189. As a direct and proximate result of Defendant's breach of confidence, Plaintiff and the Class are entitled to actual, consequential, and nominal damages and injunctive relief, with amounts to be determined at trial.

**COUNT III**
**UNAUTHORIZED USE OF NAME**

**(VA Code Ann. § 8.01-40)**
**(On Behalf of Plaintiff and the Classes)**

190. Plaintiff incorporates the above allegations as though fully set forth herein.

191. The Private Information of Plaintiff and Class Members consists of their name and private and confidential facts and information that were never intended to be shared beyond private communications.

192. Upon information and belief, Plaintiff and Class Members used their computers, mobile devices, and other electronic devices in their private quarters (*i.e.*, their home and other equally private quarters).

193. By intercepting Plaintiff and the Class's communications using Tracking Tools and sharing those communications with Unauthorized Parties, Defendant utilized their name and Private Information to copy and deliver it to Unauthorized Parties without Plaintiff and the Class's consent.

194. Plaintiff and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to Unauthorized Parties.

195. Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential and to not use it for advertising purposes or for the purposes of trade.

196. Defendant's surreptitious recording and intentional transmission of Plaintiff and Class Members' Private Information to Unauthorized Parties, is highly offensive to a reasonable person.

197. Defendant's willful and intentional disclosure of Plaintiff and Class Members' Private Information constitutes an intentional interference with Plaintiff and the Class Members'

interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

198. Defendant's conduct constitutes an knowing use of Plaintiff and Class Members' name and Private Information because Defendant facilitated Unauthorized Parties' simultaneous eavesdropping and wiretapping of confidential communications for marketing and/or purposes of trade.

199. Because Defendant knowingly incorporated the Tracking Tools and encouraged patients to use the Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

200. As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiff and Class Members was disclosed to Unauthorized Parties for Defendant's advertising purposes and/or purposes of trade through the pecuniary benefits it gained through the allowance of Unauthorized Parties pixel tracker on Defendant's Website, causing Plaintiff and the Class to suffer damages.

201. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of the Unauthorized Parties and the wrongful disclosure of the information cannot be undone.

202. Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to the Unauthorized Parties who, upon information and belief, continue to possess and utilize that information.

203. Plaintiff, on behalf of themselves and Class Members, seek compensatory damages for Defendant's unauthorized privacy violations, which includes the value of the privacy interest invaded by Defendant, that Defendant be prohibited from utilizing pixel trackers on Defendant's website or otherwise, plus prejudgment interest, and costs.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Classes)**

204. Plaintiff incorporates the above allegations as though fully set forth herein.

205. Defendant benefits from the use of Plaintiff and Class Members' Private Information and unjustly retained those benefits at their expense.

206. Plaintiff and Class Members provided their Private Information to Defendant in exchange for medical services. Plaintiff and Class Members used Defendant's Website to search for specific medical information relating to Defendant's medical services without knowledge that Plaintiff's and Class Members' Private Information would be intercepted by Defendant's Tracking Tools and disseminated to Unauthorized Parties who used such information to target advertisements to Plaintiff and Class Members.

207. Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

208. Plaintiff and Class Members' Private Information have economic value.

209. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

210. The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Virginia and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

211. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Classes)**

212. Plaintiff incorporates the above allegations as though fully set forth herein.

213. A contract implied in fact is one form of an enforceable contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words.

214. As a condition of utilizing Defendant's digital platforms and receiving medical services from Defendant, Plaintiff and the Class provided their Private Information and compensation for their medical care.

215. When Plaintiff and Class Members provided their Private Information to Defendant, they entered into implied contracts pursuant to which Defendant agreed to safeguard and not disclose Plaintiff's and the Class's Private Information without consent or authorization.

216. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

217. Plaintiff believed at the time they used Defendant's Website and provide information and/or utilized search tools that Defendant had represented it would not utilize Plaintiff's Private Information for marketing or commercial purposes without their consent.

218. Defendant breached these implied contracts by disclosing Plaintiff and Class Members' Private Information to Unauthorized Parties. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

219. Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

**COUNT VI**
**NEGLIGENCE**
**(In the Alternative on Behalf of Plaintiff and the Class)**

220. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

221. Plaintiff and the Class entrusted their Private Information to Defendant, including their browsing history on its Website, on the premise and with the understanding that Defendant would safeguard their Private Information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

222. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to partner and share information with Google—would

compromise their Private Information and/or be provided and used without authorization. And here, that foreseeable danger came to pass.

223. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if their Private Information was wrongfully disclosed.

224. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's unknown business practices. After all, Defendant actively sought and obtained Plaintiff and Class Members' PII.

225. Defendant owed a duty to Plaintiff and Class Members not to provide unauthorized disclosure of their Private Information to unauthorized third parties, such as Google, and/or to notify Plaintiff and Class Members of its Website's use of Google's Trackers and obtain their authorization to disclose Private Information obtained and shared through its Website.

226. Defendant knew or reasonably should have known that the failure to exercise due care in collecting, storing, sharing, and using the Private Information of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the class, even if the harm occurred through acts of a third-party.

227. Defendant's duty to use reasonable measures not to disclose Plaintiff and Class Members' Private Information arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

228. The risk that unauthorized persons would gain access to the Private Information and misuse it was foreseeable, as Defendant was sharing the Private Information with Google and knew or should have known it had that ability to determine the patient's information associated with the unauthorized sharing of Private Information gleamed from Defendant's Website utilizing the Tracking Tools.

229. Private Information is highly valuable, and Defendant knew, or should of known, the risk in obtaining, using, handling, storing, and sharing of Private Information of Plaintiff and the Class and the importance of exercising reasonable care in handling it.

230. Defendant breached by failing to exercise reasonable care in how it configured its Website and in handling and securing the Private Information of Plaintiff and Class Members which actually and proximately resulted in the unauthorized disclosure of Plaintiff and Class Members' Private Information.

231. As a direct and traceable result of Defendant's negligence in configuring its Website and permitting Unauthorized Parties' use of Tracking Tools, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, embarrassment, humiliation, frustration, and emotional distress.

232. On information and belief, Plaintiff's Private Information has already been shared with Unauthorized Parties because of Defendant's negligence in configuring its Website.

233. Defendant's breach of its common-law duty to exercise reasonable care in configuring and maintaining its website, actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendant as follows:

1. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;
2. A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including actual and statutory damages, punitive damages, attorney fees, expenses, costs, and such other and further relief as is just and proper;
3. An order for equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;
4. An order for injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;
5. A judgement in favor of Plaintiff and the Class awarding them damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;
6. A judgment in favor of Plaintiff and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and
7. An award of such other and further relief as this Court may deem just and proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 21, 2026

Respectfully submitted,

/s/C.J. Cuneo
C.J. Cuneo
**MILBERG, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (866) 252-0878
cjcuneo@milberg.com

William B. Federman*
Alex J. Ephraim*
*Pro Hac Vice Forthcoming*
**Federman & Sherwood**
10205 N. Pennsylvania Ave
Oklahoma City, OK 73120
Telephone: (405) 235-1560
E: wbf@federmanlaw.com
E: aje@federmanlaw.com

*Attorneys for Plaintiff*
*and Proposed Class*